372 A.2d 1218

**William J. DIAMON and Clara A. Diamon, his wife, Appellants,**

v.

**PENN MUTUAL FIRE INSURANCE COMPANY.**

Superior Court of Pennsylvania.

Argued Nov. 16, 1976.
Decided April 19, 1977.

Henry J. Rea, Jr., Pittsburgh, for appellants.

R. Charles Thomas, Meadville, with him Bozic, Thomas & Johnson, Meadville, for appellee.

Before JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This is an appeal from an order granting a motion for summary judgment. The motion was filed by an insurance company, resisting a claim by its insured.

It is established that "[t]he utmost fair dealing should characterize the transactions between an insurance company and the insured." *Fedas v. Insurance Company of the State of Pennsylvania,* 300 Pa. 555, 559, 151 A. 285, 286 (1930). It is also established that a motion for summary judgment should be granted only in the clearest of cases, which is to say, only when there is no material issue of fact and no doubt about what the result should be. *See Just v. Sons of Italy Hall,* 240 Pa.Super. 416, 368 A.2d 308 (filed April 22, 1976) (collecting cases). Here, whether there was the utmost fair dealing is by no means clear. The order of the lower court should therefore be reversed and the case remanded for further proceedings.

I

On December 4, 1967,[1] appellants purchased from appellee a fire insurance policy that covered appellants' home, appurtenant private structures, and unscheduled personal property, and provided reimbursement of such additional living expenses as might result from a fire. The policy contained the following provision:

No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within twelve months next after inception of the loss.

This is a standard provision required by statute. Act of May 17, 1921, P.L. 682, 40 P.S. § 636.

On April 9, 1968, while appellants were in Florida, their home, garage, and furniture were destroyed by a fire. On July 22, 1968, appellants filed a sworn proof of loss with appellee, claiming $20,000 for the loss of their home, $250 for the loss of their garage, $8,000 for the loss of their furniture, and $4,000 for additional living expenses.

On September 17, 1968,[2] after an investigation by one of its claims adjusters, appellee rejected appellants' proof of loss and refused to pay their claim.

Also on September 17, 1968, the District Attorney of Crawford County filed a criminal complaint against appellant William Diamon, charging him with filing a false proof of loss; it was alleged that appellant had removed the furniture from his home before the fire.

On January 28, 1969, appellant was indicted for attempted cheating by false pretenses, and on February 11, 1969, a jury

1. The findings of fact made by the lower court are the basis for this history.

2. In appellee's Answer and New Matter it is alleged that on Sept. 17, 1968, appellee notified appellants in writing that it rejected their proof of loss and would not pay the amount claimed. In their Reply to New Matter appellants "aver that they cannot remember" when the claim was rejected but admit that in fact it was rejected. The lower court found that the claim was rejected on Sept. 17, 1968.

found him guilty of the charge. This was a miscarriage of justice, as became apparent when, later in February, appellant secured a bulldozer and dug up rubble at the site of his former home, uncovering pieces of the furniture for the loss of which he had made claim in his proof of loss. On the basis of this after-discovered evidence the trial court on March 2, 1970, granted appellant a new trial, and on December 21, 1970, the District Attorney asked and was granted leave to enter a *nolle prosequi.*

On April 5, 1974, appellants filed a complaint in assumpsit to recover $32,250 from appellee ($20,000 for their home, $250 for their garage, $8,000 for their furniture, and $4,000 for additional living expenses). By answer and new matter appellee alleged that appellants had "failed . . . to comply with the provisions of the policy that suit be commenced within twelve (12) months next after inception of the loss . . .." This allegation was the basis of appellee's motion for summary judgment, which was filed on January 31, 1975. Affidavits in support of and against the motion were filed, and on February 5, 1976, the lower court granted the motion.

In its opinion explaining why it had granted the motion the lower court accurately summarized the issues raised by appellants:

(a) The Company waived the twelve months suit requirement by action of its agent in causing criminal charges to be filed by the county detective.

(b) This conduct caused *a complete waiver—not* a postponement of the twelve month requirement and thus the Diamons could bring suit any time within the general six year statute of limitation period applicable to assumpsit action.

—or in the alternative—

(c) Even though the criminal charge against William J. Diamon was "nolle prossed" by the District Attorney, he was "forced by the circumstances" to wait out the five years statute of limitation applicable to the criminal charge before he brought suit against the Company.

Diamon's argument is that he could still be reprosecuted on the same charge until July 22, 1973, and *if* he filed civil action under the policy, he ran the risk of Company retaliation by the refiling of the criminal charge. Diamon argues that once the five year statute had run out on the criminal charge, he had *an additional* twelve months from the date to file his claim and did so eight months and thirteen days later on April 4, 1974.

Slip Opinion at 3–4 (emphasis in original).

## II

### A

The terms "waiver" and "estoppel" have come to have their own special meaning in the context of insurance law.[3] In *O'Connor v. Allemania Fire Insurance Company,* 128 Pa.Super. 336, 339–40, 194 A. 217, 218–19 (1937), this court noted:

Some confusion has resulted from a careless and, perhaps, not wholly accurate use in the decisions of the words "waive" and "waiver" in connection with the clause in the policy limiting the time within which an action may be brought upon it, when what was really meant was such conduct on the part of the insurer or its authorized representatives as to excuse the insured from strict compliance with the terms of the policy and to extend the period for bringing suit. . . . Undoubtedly there may be an express *waiver* of the limitation of suit clause in the policy, and when there is such a definite *waiver,* it is no longer in force and thereafter the *statutory* limitation as to contracts applies; but our Supreme Court has ruled that when the insured seeks to excuse his failure to bring suit within the period of time fixed in the policy by conduct of the insurer which misled the insured to his injury—the failure of the insured to bring suit within the prescribed time being due to the insurer's act or conduct—, the limitation has not been fully and completely

3. Couch on Insurance 2d § 75.183.

*waived* in the strict sense of the word, but has only been suspended or extended, and begins to run when the insurer's conduct no longer excuses the insured's failure to bring suit.

Two patterns of events in which recovery may be allowed despite an action being brought more than twelve months after the loss are discernable from the decisions. The facts in *O'Connor v. Allemania Fire Insurance Company, supra,* are representative of one pattern.[4] When the contents of a dwelling were destroyed by fire, the insured filed a claim for the loss. The insured and the insurer's adjuster then attempted to resolve disagreements regarding the value of the goods lost. Some thirteen or fourteen months after the loss these negotiations came to a halt, in December 1925 or January 1926, when the insurer asserted that it would not pay anything on the claim. The insured brought an action in assumpsit to recover for the loss on December 1, 1927. This court affirmed the lower court's judgment for defendant n. o. v., holding that:

> [W]here the acts or conduct of the insurance company and its duly authorized representatives have been such as to estop it from strictly enforcing the limitation clause . . *the clause begins to run again when the company definitely announces its refusal to pay* under the limitation clause and the insured, who is in full possession of the facts, must bring his or her action within a reasonable time thereafter, not exceeding twelve months followed such refusal.
> 128 Pa.Super. at 347, 194 A. at 221 (emphasis added).

The facts of *Fritz v. British America Assurance Company,* 208 Pa. 268, 57 A. 573 (1904), are representative of the second pattern. On September 20, 1897, personal property

---

4.  *Commonwealth v. Transamerica Company,* 462 Pa. 268, 341 A.2d 74 (1975); *Arlotte v. National Liability Insurance Company,* 312 Pa. 442, 167 A. 295 (1933); *Terpeluk v. Insurance Company of North America,* 189 Pa.Super. 259, 150 A.2d 558 (1959). *See also McMeekin v. Prudential Insurance Company of America,* 348 Pa. 568, 36 A.2d 430 (1944); *Sudnick v. Home Friendly Insurance Company,* 149 Pa.Super. 145, 27 A.2d 468 (1942).

belonging to the insured was partially destroyed by fire. After filing his claim and proof of loss, the insured and the insurer's adjuster entered into settlement negotiations. A disagreement as to the amount of the loss lead to the appointment of appraisers on April 15, 1898, as provided by the policy. On January 18, 1900, the insured brought an action in assumpsit to recover his loss, alleging that within the last sixty days the appraisers had abandoned the appraisement. In reversing the non-suit entered for the insurer the Supreme Court stated:

> The company having required an appraisement by reason of its inability to agree with the insured as to the amount of the loss must be regarded as having waived its right to enforce the limitation clause until the appraisers have made an award or the appraisement has been abandoned, unless the award has been delayed or the appraisement has been abandoned by reason of the conduct of the insured. *When the appraisement has been terminated, either by an award or an abandonment without fault of the parties, the time within which an action may be brought begins to run.*

208 Pa. at 275, 57 A. at 576 (emphasis added.)

Reflection upon these cases will show that when the problem arises, whether an insurer is estopped from enforcing, or will be regarded as having waived its right to enforce, the limitation clause, two questions must be answered: did the insurer take some action that suspended the clause; and if it did, so that suspension occurred, did something happen to start the clause running again?

B

It is reasonably plain from the record we have that the District Attorney filed the criminal complaint against appellant William Diamon as a result of being told by appellee's adjuster that Diamon had attempted to cheat the

company.[5]  This action by the adjuster suspended the limitation clause.

In *Abolin v. Farmers American Mutual Fire Insurance Company,* 100 Pa.Super. 433 (1930), the insured brought suit on January 28, 1927, to recover for a fire loss that had occurred on January 8, 1926.  In rejecting the insured's argument that the suit was timely this court said:

The most that the [insured] could show was that five or six months after the fire, and months before the limitation in the policy became effective, when the [insured] asked whether the company was going to pay his claim he was told by the managers that they had not decided whether they would pay him or arrest him, apparently for being concerned in the burning of the insured property.  There was certainly nothing in this statement that was by way of inducement to withhold bringing suit, or that evidenced any intention on the part of the company to waive this provision of the contract.

100 Pa.Super. at 436.

It is apparent from this statement that if the company had told the insured that it *had* decided to have him arrested, and if in fact (as here) he had been arrested, there would

**5.** The record is not fully developed.  *See,* however, paragraph 4 of the affidavit filed by appellant William Diamon in opposition to the motion for summary judgment:

4.  I was told by Walter E. Linn, former county detective of Crawford County, that he signed the controversial criminal information against me for cheating with false pretenses, at the instigation of John J. Hurban, Sr., agent and adjuster for Penn Mutual Fire Insurance Company, defendant herein.

This is not in proper form.  Pa.R.Civ.P. 1035(d).  It nevertheless appears from the record to be correct.  Appellee submitted in support of the motion for summary judgment an affidavit by the District Attorney in which the following statement appears:

This charge arose out of a certain fire which occurred at the residence of William J. Diamon on April 9, 1968, and alleged that the said William J. Diamon had made a representation to John J. Hurban, Sr., Agent for Penn Mutual Insurance Company that the said William J. Diamon had had destroyed personal property of the value of $20,000 in said fire and further alleged that in truth and fact the said William J. Diamon had removed said personal property from said house in December 1967.

have been such an "inducement to withhold bringing suit" as would have suspended the limitation clause.

In a similar context our Supreme Court has found that an allegation of fraud by the insurer precluded the insurer from asserting the time limit for filing the proof of loss. *Simons v. Safety Mutual Fire Insurance Company*, 277 Pa. 200, 120 A. 822 (1923). *Fedas v. Insurance Company of the State of Pennsylvania, supra*, is to the same effect. There, the insured brought an action in assumpsit on a fire insurance policy for the partial destruction of her home and its contents. The policy provided that proof of loss must be filed within sixty days of loss. An adjuster told the insured that the company would not pay her claim because she was criminally responsible for the fire that caused the loss. The authorities attempted to establish that responsibility but the action was dropped for lack of proof. The insured then filed her proof of loss, several months after the sixty day limitation had passed. The lower court held she was estopped from setting up the company's waiver of the sixty day limitation. Reversing, the Supreme Court said:

> An estoppel exists where one by his words or conduct causes another to believe in the existence of a state of facts, inducing reliance thereon . . . But one is not estopped unless the contemplated action would prejudicially injure another. Wherein was the insurance company injured, or in what respect did it alter its position after the waiver, by receiving the proof of loss . . .? *It declined to pay for a reason that afterward turned out to be without foundation.* The rights of the parties were fixed.

300 Pa. at 560, 151 A. at 287 (emphasis added).

So here. Appellee's assertion that appellant William Diamon was criminally responsible has turned out to be without foundation. When appellee made its mistaken charge against him, the rights of the parties were fixed, which is to say, the limitation clause was suspended. To hold that it was not would be to enable appellee to benefit from its own mistake.

## C

■ Having determined that the limitation clause was suspended, the next question is whether something happened to start it running again. On the record we have we cannot answer this question.

Cases such as *O'Connor v. Allemania Fire Insurance Company, supra,* show that the limitation clause would have started to run again if, after the criminal charge against appellant William Diamon was nol prossed, appellee had "definitely announce[d] its refusal to pay." 128 Pa.Superior Ct. at 347, 194 A. at 221. However, it does not appear from the record that appellee made any such announcement. Given this circumstance, it might be held that the suspension of the clause continued in effect; the reasoning might be that since appellee started the suspension, it was obliged to end it. On this reasoning, appellants' complaint was filed in time, for the only limitation that remained applicable was the six year statute of limitations, Act of March 27, 1713, 1 Sm.L. 76, § 1, 12 P.S. § 31, which was met.

This conclusion, however, appears precluded by *Fritz v. British America Assurance Company, supra.* There, it will be recalled, the event that suspended the limitation clause was an appraisement, the Supreme Court stating that the clause "begins to run" "[w]hen the appraisement has been terminated, either by an award or an abandonment without fault of the parties . . ." 208 Pa. at 275, 57 A. at 576. The Court did not say, it will be noted, that in order to start the clause running again, after the abandonment of the appraisement, the insurer had to announce that it would not pay the claim. The failure of the Court to impose such a requirement appears significant. The appraisers were independent of the insurer; so was the District Attorney in the present case. If, upon learning that appraisers have abandoned their appraisement, the insurer need not announce its refusal to pay the claim as a condition of starting the clause running again, it is arguable that neither must the insurer make such an announcement upon learning that the District Attorney has abandoned the prosecution.

In this regard a further distinction is in order. In *Fritz* the appointment of the appraisers was called for by the policy. It might be said, therefore, that the abandonment of the appraisement was an event that both the insurer and insured would know had occurred; on this view, it is under-standable that the Court would hold that upon the abandon-ment, the limitation clause started to run again, without any further announcement by the insured of refusal to pay. Where the third party is some one entirely outside the policy, as was the District Attorney here, the situation is less clear. Neither the insurer nor the insured knows what the District Attorney may do. Has he abandoned the prosecu-tion, or will he perhaps at some point re-institute it?

Given this uncertainty it is not possible to formulate a fixed or automatic rule, either that the limitation clause did start to run again, from the time the nol pros was entered, or that it did not. Instead, the case should be decided by what an examination of all of the unusual facts suggest is equitable. In order to do this, a fuller record is needed, for we do not know all of the facts.

This approach is consistent with principle. The feature common to all of the cases that have been discussed is that the concept of suspension of a limitation clause is an aspect of equity. This is no where more forcefully stated than in *Fedas v. Insurance Company of the State of Pennsylvania, supra* 300 Pa. 555 at 559, 151 A. 285 at 286, where the Supreme Court said:

> The utmost fair dealing should characterize the transac-tions between an insurance company and the insured. If the insurer, having knowledge of a loss, by any act throws the insured off his guard as to the necessity of performing some duty enjoined by the policy, the insurer should not be permitted to take advantage of the failure to act. It has been held many times that an insurance company may waive filing a technical proof of loss.

Here, appellants claim that they delayed filing their com-plaint in assumpsit until the five year statute of limitations

had run,[6] because they were advised by their attorney that the nol pros did not preclude another prosecution of appellant William Diamon, and, given appellee's past conduct, they feared that to resubmit their claim would result in another complaint to the District Attorney, and another prosecution. (*See* the affidavit filed by appellant William Diamon in opposition to the motion for summary judgment.) The question is therefore presented whether appellants' fear may equitably be held to be the responsibility of appellee. The answer to this question depends on just what the adjuster, or another representative of appellee, said to appellants, and when he said it, and there is no evidence of these facts in the record.

The propriety of remand for the development of a fuller record is particularly apparent when the respective positions of the parties are compared. Appellants have lost their home, garage, and furniture, and have received nothing, even though they were insured and promptly filed their proof of loss. In addition, they have suffered the agony of an unfounded criminal prosecution. In contrast, the position of appellee is that it initiated the prosecution, and even when the prosecution proved unfounded, failed to make any payment. This failure is particularly striking when it is borne in mind that appellee's initial complaint concerned only the furniture. Thus, having made an unfounded complaint regarding $8,000 worth of furniture, appellee has refused to pay not only for the loss of the furniture but also for the loss of a $20,000 home, a $250 garage, and $4,000 additional living expenses.

**6.** The statute of limitations applicable to the crime of attempted cheating by false pretenses is two years. Act of Mar. 31, 1860, P.L. 427, § 77; Act of April 6, 1939, P.L. 17, § 1, 19 P.S. § 211. However, the limitation period for felonies is five years. *Id.* Here, appellants' attorney may have had in mind the possibility of a prosecution for arson, which is a felony. *Cf.* the opinion of the lower court, which referred to the "institution of criminal charges of arson by a company against its insured." Slip Opinion at 7. *And see* appellants' Reply to New Matter where appellants "aver they were forced to wait until all possible Statute of Limitations for Criminal Actions had lapsed before they filed their civil action against" appellee.

In its recent decision in *Brakeman v. Potomac Insurance Company*, 472 Pa. 66, 371 A.2d 193 (No. 71 March Term, 1976, filed March 16, 1977), our Supreme Court held that where an insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the company will be required to prove both that the notice provision was in fact breached and that the breach resulted in prejudice to the company. Under prior decisions an insured had the burden of proving compliance with the terms and conditions of the policy and a sufficient reason for delay. In reaching its determination that these decisions should be overruled the Court stated:

A strict contractual approach is . . . inappropriate here because what we are concerned with is a forfeiture. The insurance company in the instant case accepted the premiums paid by the insured for insurance coverage and now seeks to deny that coverage on the ground of late notice. . . .

. . . . .

[A] reasonable notice clause is designed to protect the insurance company from being placed in a substantially less favorable position than it would have been had timely notice been provided, e. g., being forced to pay a claim against which it has not had an opportunity to defend effectively. . . . *Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation.* . . . We have in the past excused a condition of forfeiture where to give it effect would have been purely arbitrary and without reason, and we are of the opinion that, in the absence of prejudice to the insurance company, such a situation exists in the contest of a late notice of accident. . . . *Allowing an insurance company, which has collected full premiums for coverage, to refuse compensation to an*

*accident victim or insured on the ground of late notice, where it is not shown timely notice would have put the company in a more favorable position, is unduly severe and inequitable.* Moreover, we do not think such a result comports with the reasonable expectations of those who purchase insurance policies.

472 Pa. at 73, 371 A.2d at 197 (emphasis added).

Similarly, here appellee has shown no prejudice from appellants' late filing of their complaint. It may well be that after remand the record will look much different, and will not show appellee in so unfavorable a light as now. The point at the moment is that remand is required so that we may have some assurance that a just result has been reached. As noted at the outset, summary judgment should not be granted when there is any doubt about what the result should be. *Just v. Sons of Italy Hall, supra.* Here there is grave doubt.

### III

There is an alternative reason why remand is required. As the record stands now, it at least suggests that appellee violated its implied agreement not to do anything that would destroy appellants' right to receive the benefits of their policy.

### A

The lower court in granting appellee's motion for summary judgment stated:

We hold that *the good faith institution of criminal charges of arson by a company against its insured, or company cooperation with law enforcement agencies* in so doing is not such conduct as constitutes a waiver or an estoppel of the insurer's contractual right to have suit filed against it within the specific period of time provided in the contract.

. . . . .

*We find nothing in the complaint or affidavits that alleges conduct on the part of the Company that abrogated the*

*requirement that suits* under the policy *had to be commenced within twelve months of the loss.*

Slip Opinion at 7 (emphasis added).

It is therefore clear that the lower court's decision turned upon the assumption that appellee acted in good faith in telling the District Attorney that appellant William Diamon had attempted to cheat it; but as the New Jersey Supreme Court has pointed out:

> Good faith is a broad concept. Whether it was adhered to by the carrier must depend upon the circumstances of the particular case. *A decision not to settle must be a thoroughly honest, intelligent one. It must be a realistic one when tested by the necessarily assumed expertise of the company.*
>
> *Bowers v. Camden Fire Insurance Association,* 51 N.J. 62, 71, 237 A.2d 857, 861 (1968) (emphasis added).

Here there is no support for the lower court's assumption that appellee acted in good faith, and indeed, the record contradicts the assumption. Thus in his affidavit opposing the motion for summary judgment appellant William Diamon states:

> 6. At my request, Mr. Linn, then county detective, Fred Carmen, ex-fire captain, retired, together with James E. Stritzinger, a bulldozer operator, went out to the property and discovered all of my burned and destroyed household goods and furnishings *both sitting above the surface of the ground* and buried underneath the debris; the bulldozer was used to excavate the cellar and expose much of the burned furniture.
>
> (Emphasis added)

This prompts one to wonder about the quality of the investigation conducted by appellee's adjuster. What personal observations did he make, to whom did he talk, and what efforts did he make to verify what he was told, before he told the District Attorney that appellant William Diamon had moved the furniture from the home before the fire? Perhaps the investigation was conducted in a responsible manner; but that is not the way it appears now.

In *D. B. Van Campen Corp. v. Building & Construction Trades Council of Phila.*, 202 Pa.Super. 118, 122, 195 A.2d 134, 136–37 (1963), this court stated:

> The law is clear that "In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract. Accordingly, a promise to do an act necessary to carry out the contract must be implied." 8 P.L.E., Contracts, § 140.

5 Williston, Contracts, § 670 at 159 (3d ed. 1961). *Accord, Association Group Life Inc. v. Catholic War Veterans of United States of America*, 61 N.J. 150, 293 A.2d 382 (1972); *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 200 A.2d 166 (1964).

When this principle is applied to the present case it will be seen that implied in the policy was a promise by appellee that it would exercise reasonable care in investigating a claim by appellants. When an insured has contracted for protection against a specified loss, he is entitled to expect that a claim made under the policy will not be rejected except for good cause.[7] If an insurer could reject a claim for any reason, whether well-founded or not, the protection for which the insured had contracted would be illusory.[8] The insurer's promise to exercise reasonable care

---

7. *See generally* R. Keeton, Insurance Law, § 6.3 (1971).

8. In *Brakeman v. Potomac Insurance Company, supra,* besides relying on the fact that a forfeiture was involved, *see* text, *supra* 472 Pa. at pp. 72, 73, 372 A.2d at pp. 1224, 1225, our Supreme Court noted:

> The rationale underlying the strict contractual approach reflected in our past decisions is that courts should not presume to interfere with the freedom of private contracts and redraft insurance policy provisions where the intent of the parties is expressed by clear and unambiguous language. We are of the opinion, however, that this argument, based on the view that insurance policies are private contracts in the traditional sense, is no longer persuasive. *Such a position fails to recognize the true nature of*

in investigating a claim is necessary to ensure that the insurer "refrain[s] from doing anything that would destroy or injure [the insured's] right to receive the fruits of the contract."

This reasoning has been adopted by our Supreme Court in other areas of insurance law. In *Gedeon v. State Farm Mutual Automobile Insurance Company*, 410 Pa. 55, 59, 188 A.2d 320, 322 (1963), the Court in discussing the obligation that an insurer assumes under a typical automobile liability insurance policy stated:

[B]y asserting in the policy the right to handle all claims against the insured, including the right to make a binding settlement, the insurer assumes a fiduciary position towards the insured and becomes obligated to act in good faith and with due care in representing the interests of the insured. If the insurer is derelict in this duty, as where it negligently investigates the claim or unreasonably refuses an offer of settlement, it may be liable regardless of the limits of the policy for the entire amount of the judgment secured against the insured.

*Accord, Rova Farms Resort, Inc. v. Investors Insurance Company of America*, 65 N.J. 474, 323 A.2d 495 (1974); *Bowers v. Camden Fire Insurance Association, supra; Crisci v. Security Insurance Company of New Haven*, 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173 (1967); *Comunale v.*

the relationship between insurance companies and their insureds. An insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured. The only aspect of the contract over which the insured can "bargain" is the monetary amount of coverage. . . . Thus, an insured is not able to choose among a variety of insurance policies materially different with respect to notice requirements, and a proper analysis requires this reality to be taken into account. 371 A.2d at 196 (emphasis added).

See also, R. Keeton, Insurance Law, § 6.3(a), at 350–51 (1971): Insurance contracts continue to be contracts of adhesion, under which the insured is left little choice beyond electing among standardized provisions offered to him, even when the standard forms are prescribed by public officials rather than insurers. Moreover . . . most insurance policy provisions are still drafted by insurers . . . . Under such circumstances as these, judicial regulation of contracts of adhesion . . . remains appropriate.

*Traders & General Insurance Company,* 50 Cal.2d 654, 328
P.2d 198 (1958).

█ The duty of good faith and due care in investigating
the insured's claim thus implied in the contract is an express
condition of the contract.[9] Strict compliance is therefore
required,[10] and the detriment suffered by an insured who
reasonably expected that a valid claim would be paid must
be compensated for in damages. In *Gray v. Nationwide
Mutual Insurance Company,* 422 Pa. 500, 223 A.2d 8 (1966),
the claim was that the insurer had wrongfully refused to
settle a claim against its insured. Citing and quoting from
*Cowden v. Aetna Casualty and Surety Company,* 389 Pa.
459, 134 A.2d 223 (1957), and *Gedeon v. State Farm Mutual
Automobile Insurance Company, supra,* the Court held:

> We believe that this recent case law, employing contractu-
> al terms for the obligation of the insurer to represent in
> good faith the rights of the insured, indicates that a
> breach of such an obligation constitutes a breach of the
> insurance contract for which an action of assumpsit will
> lie.

*Id.* 422 Pa. at 508, 223 A.2d at 11.

## B

█ In what relationship does appellee's implied duty of
good faith and due care in investigating appellants' claim
stand with respect to appellants' contractual obligations
under the policy? Specifically, if appellants are able to
establish on remand that appellee did breach its duty, must
their claim fail nevertheless because the action was not
brought within twelve months of the loss?

This question is answered by *Gruenberg v. Aetna Insur-
ance Company,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032
(1973). There the California Supreme Court considered the

9. "An express condition is provided for by the parties. It may be
spelled out clearly in so many words or it may be implied in fact;
that is 'gathered from the terms of the contract as a matter of
interpretation.' " J. Calamari and M. Perillo, Contracts, § 141 (1970),
5 Williston, Contracts, § 668 at 152–53 (3d ed. 1961).

10. 5 Williston, Contracts, § 669 at 154 (3d ed. 1961).

insurer's duty not to withhold unreasonably payments due under a policy. The insured alleged that three insurers wilfully and maliciously entered into a scheme to deprive him of the benefits of the fire insurance policies on his restaurant. Besides encouraging the bringing of criminal charges against the insured, by suggesting to the authorities that the coverage was excessive, the insurers through their attorney demanded that the insured submit to an examination under oath and produce certain documents to them while the criminal charges were pending. This demand was based on a "cooperation and notice" clause contained in the policy. On the advice of his counsel the insured refused to submit to the examination or to produce the documents. The insurers subsequently denied liability, basing the denial on this refusal. Said the California Supreme Court:

> All parties appear to assume that [the insured's] contractual duty is a dependent condition . . . to [the insurers'] covenant of good faith and fair dealing. In other words, the underlying premise of their arguments is that if [the insured's] failure to appear . . . constituted a breach of [the insured's] obligation under the policies, then [the insurers'] duty of good faith and fair dealing was excused. We do not think, however, that the controlling issue here is the nature of [*the insured*'s] duty, *i. e.*, whether his dependent duty is precedent or subsequent; rather, the crucial issue is the nature of [*the insurers'*] duty, *i. e.*, whether their duty of good faith and fair dealing is absolute or conditional.
>
> .  .  .  .  .  .
>
> While it might be argued that [the insurers] would be excused from their contractual duties (*e. g.*, obligation to indemnify) if [the insured] breached his obligations under the policies, we do not think that [the insured's] alleged breach excuses [the insurers] from their duty, implied by law, of good faith and fair dealing. In other words, the insurer's duty is unconditional and independent of the performance of [the insured's] contractual obligations. 9 Cal.3d at 577–78, 108 Cal.Rptr. at 487–88, 510 P.2d at 1039–40 (emphasis in original).

This reasoning is persuasive. Otherwise the insurer could circumvent its duty to act in good faith by asserting a violation by the insured of a contractual obligation that would not have occurred but for the insurer's own action in denying the claim.[11]

Decisions of our own Supreme Court are not quite so much in point as *Gruenberg v. Aetna Insurance Company*, but are to the same effect.

In *Arlotte v. National Liberty Insurance Company*, 312 Pa. 442, 167 A. 295 (1933), the insured parties, after giving their insurer prompt notice of their loss, were told that the loss was not covered by the policy. The insured parties, who could not read English and could not find their policy, relied on this assertion and did not bring an action to recover for their loss until they found the policy more than a year after the loss. The insurer set up as a defense the fact that the proof of loss had not been filed within sixty days and that the loss had occurred more than twelve months ago. The Supreme Court rejected this defense stating:

Had it not been for [the agent's] misrepresentation of the terms of the policy, all the conditions precedent to the maintenance of this action doubtless would have been performed by [the insured parties]. . . . [The insurer] is precluded from taking advantage of the nonperformance of these conditions, if it is properly to be held responsible for [the agent's] misrepresentation.

312 Pa. at 446, 167 A. at 296.

11. In *Gruenberg v. Aetna Insurance Company, supra*, the California Supreme Court after finding the duty of good faith and fair dealing unconditional pointed out:

Even if [the insurers'] duty were construed as a *dependent* condition, *i. e.,* dependent on [the insured's] performance of his obligations under the policies, we think that [the insured's] failure to appear would still not be fatal to his cause of action. That is, the allegations of the complaint demonstrate that [the insured's] failure to appear was induced by [the insurers'] conduct, in breach of their duty of good faith and fair dealing. Therefore, [the insured's] obligation to appear may be seen as excused by [the insurers'] alleged breach.

9 Cal.3d at 578 n. 9, 510 P.2d at 1040 n. 9, 108 Cal.Rptr. at 488 n. 9, (emphasis in original).

Similarly, where the insurer has asserted that the insured's fraud is the only reason for denying the claim, the insurer should not be allowed to set up a different defense after the insured has proved himself blameless. *Simons v. Safety Mutual Fire Insurance Company*, 277 Pa. 200, 120 A. 822 (1923).[12]

From these decisions the conclusion follows that if on remand appellants can establish that appellee did not exercise reasonable care in investigating their claim, their action to recover on the policy is not barred by their failure to comply with the limitation clause.

The order of the lower court is reversed and the case remanded for further proceedings.

HOFFMAN and CERCONE, JJ., concur in the result.

VAN der VOORT, J., notes his dissent.

WATKINS, Presiding Judge, absent.

---

**12.** The insured gave prompt notice to his insurer of his loss. The only reason asserted by the insurer for delaying settlement was that the claim was dishonest. However, at the trial no evidence of the insured's fraud was offered. The Court held that the insurer could not now allege as a defense that proofs of loss were not timely filed or that the inventory of property was not correct because:

> When a definite reason for declining to pay is asserted, and the [insured] thus led to believe it the sole cause, and is misled to his injury, the company is estopped from thereafter setting up a different ground . . ..

*Id.* at 203–04, 120 A. at 823.